THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* AURELIUS C. TURPIN, Plaintiff in Error.

*Opinion filed April 23, 1908.*

1. CONFIDENCE GAME—*statute does not cover business transactions between parties on equal footing.* The statute relating to the confidence game does not apply to a business transaction between parties dealing on an equal footing, even though one of them may believe he has parted with more than he received.

2. SAME—*what does not authorize conviction.* A conviction of the confidence game cannot·be based upon a general trade, at arm's length, between the defendant and the complaining witness, in which they exchanged, at fictitious and exaggerated values, stocks and bonds and deeds purporting to convey lands which neither had ever seen, where both parties were "traders," who had acquired their property for trading purposes without any particular investigation as to its value, and where it cannot be ascertained from the evidence which party, if either, was swindled.

3. SAME—*when a witness is incompetent to give opinion that bonds are worthless.* A witness called by the People to prove that certain bonds traded by the defendant in a confidence game prosecution were worthless is not competent to give an opinion to that effect, where he is not shown to have any knowledge whatever of the particular bonds, never having bought or sold any of them, nor even seen any, except those in evidence.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding.

CANTWELL & ROTH, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (F. L. BARNETT, of counsel,) for the People.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Aurelius C. Turpin, the plaintiff in error, and James Low, were indicted in the criminal court of Cook county on the charge of obtaining from William G. Schroeder six deeds of various values to said Schroeder, who was then and

there the owner of said deeds, the same being the personal goods and property of said Schroeder, by means and use of the confidence game. A motion to quash the indictment was overruled by the court. Upon a trial the defendants were found guilty by a jury. A motion for a new trial was granted as to Low and overruled as to Turpin. After overruling Turpin's motion in arrest of judgment the court sentenced him to the penitentiary for an indeterminate term. Turpin filed his bill of exceptions and sued out this writ of error.

The principal errors relied on for a reversal are, that the indictment was insufficient and should have been quashed; the giving of erroneous instructions on behalf of the People and refusing to give proper instructions requested by plaintiff in error; the admission of incompetent evidence on behalf of the People; and that the verdict should have been set aside because it is not supported by sufficient evidence. In the view that we take of this case it will not be necessary to consider any of the alleged errors except the one last above stated.

The evidence shows that plaintiff in error was known as a "trader." His business seems to have been to exchange real estate, stocks and bonds for other property. He made his headquarters, for business purposes, at the Chicago Hotel, where a number of other persons engaged in the same line of business were putting up. These so-called "traders" made deals with each other very freely, and apparently without regard to the location, value or title of the property involved. In most instances the manifest purpose was to acquire property with a view of trading it, in turn, to someone else, so that exchanges were made based upon the supposed "trading value" of property instead of the real cash value. The trading value was rather a vague and variable standard. It meant such value as ingenious and energetic puffing would lead the buyer to believe he could realize from the stuff in his next deal. Schroeder, the prosecuting witness,

resided at South Bend, Indiana, and was seventy-nine years of age. He was engaged in trading in real estate, stocks and bonds at South Bend. For thirty-five years of his life he had been engaged in teaching in various institutions of learning in the State of Indiana. He came to Chicago in December, 1905, looking for "trades." He went to the Chicago Hotel and there met Low. He and Low talked over their various properties and both of them became satisfied that they could do some trading. Schroeder did not have his title papers with him, and Low told him to go back home and get his papers and upon his return he would trade with him. Among other things that Schroeder told Low he had at home, he mentioned some Colorado mining stocks, which he, however, said were worthless. Low said: "There is no such thing as worthless mining stocks; bring them along when you return and I will trade for them." Low was eight years older than Schroeder. In accordance with Low's suggestion Schroeder brought the mining stocks with him on his return to Chicago, a month later. On January 10, 1906, Schroeder re-appeared at the Chicago Hotel, inquiring for an elderly gentleman, known as a "trader," by the name of Low. He found him, and negotiations were soon well under way. Schroeder had in his valise deeds purporting to convey to him title to large quantities of real estate in Indiana, Michigan, Missouri and Colorado, the trading value of which was, according to his claim, many thousand dollars. One particular eighty acres of iron ore land in Missouri Schroeder thought might be worth a million dollars. The valise also contained the Colorado mining stocks. Low had a valise also, and in it he had the evidence of title to properties of fabulous value, largely made up of stocks and bonds. If it became necessary, however, to even up inequalities in value, to put in a quantity of land, Low was always prepared to put it in. These trades were made without any examination of the properties involved and with no information other than that furnished

by the owner, and all he knew, in most cases, was what
the man said who traded them to him. During the two
days that Schroeder remained at the Chicago Hotel the con-
tents of his valise underwent a complete change. He made
numerous trades with Low and Turpin. These several
transactions so intermingled and overlapped each other that
it is difficult to get a clear understanding of the details of
each particular trade. Counsel for both parties admit the
confusion and attempt to explain, but their explanations are
not clear. The merits of this controversy do not depend
upon an accurate understanding of the details of all or any
one of the trades. Enough appears to show that in his first
trade Schroeder traded Low eighty acres of land in Kit
Carson county, Colorado, for a section of land in Presidio
county, Texas, and for eighty acres of land in Roscommon
county, Michigan, Low traded Schroeder two sections of
land in Yoakum county, Texas. Schroeder put his Colo-
rado mining stock into this trade. The second trade was
between Schroeder and plaintiff in error, Turpin. Schroe-
der traded Turpin fifty acres known as the "South Bend
property," subject to a mortgage of $1000. There was
also a second mortgage for $500 on this fifty acres which
Schroeder did not mention. Schroeder also traded him
eight lots in Valverde, Colorado, and two hundred and
twenty acres in Howe county, Missouri, and Turpin traded
Schroeder a half interest in five thousand acres of land in
Johnson county, Kentucky, plaintiff in error agreeing to
pay $500 difference. Twenty-five dollars was paid in cash
and the balance was to be paid in thirty days, and was
secured by a mortgage on the "iron ore eighty" in Howe
county, Missouri, which was a part of the two hundred and
twenty acres Schroeder traded to plaintiff in error. After-
wards, on March 15, 1906, Schroeder made another trade
with plaintiff in error, in which he traded plaintiff in error
his undivided half interest in the Kentucky land for five
$1000 bonds issued by the South Carolina Railway Com-

pany, and by another trade, in which Schroeder received $75 in cash, he obtained another $1000 bond of the South Carolina Railway Company and some amount of stock in an oil and petroleum company. In this last trade Schroeder released his mortgage on the "iron ore eighty" in Missouri. As the result of this last trade Schroeder had $6000 in the bonds of the South Carolina Railway Company, the plaintiff in error and Low had Schroeder's deed to the real estate above referred to and the possession of the Colorado mining stocks.

It is claimed that the bonds of the South Carolina Railway Company are worthless. This claim is not established by any competent evidence in the record. On the trial defendant in error called a witness by the name of Bell, who is connected with the Harris Trust and Savings Bank, who testified, over the objection of plaintiff in error, that in his opinion as a dealer in bonds these bonds were worthless. The witness had never bought or sold any of these bonds, nor had he ever seen any except those introduced in evidence. This was all the evidence offered on this question. We do not think that the witness showed any knowledge whatever of the particular bonds in question, and he was therefore not competent to give an opinion as to their value.

But even if it be conceded that the bonds are worthless, still the evidence does not bring Schroeder within the protection of the statute upon which this prosecution is based. It is apparent from the nature of the transactions between the parties that they were upon an equal footing, dealing at arm's length in properties at fictitious and greatly exaggerated values. When the whole evidence is considered it is impossible to say which party, if either, is swindled. There is no competent evidence in the record that Schroeder had any title whatever to any of the real estate which he traded to Low and plaintiff in error. There is no evidence of the cash value of any of the property that Schroeder traded, unless it may be his testimony in regard to the South Bend

fifty acres.   Schroeder admits that he had never seen the Michigan, Colorado or Missouri lands.   On the other hand, Turpin had never seen the Kentucky lands and Low had not seen the Texas land.   The parties all acquired claim of title by trades, for trading purposes.   We have no doubt, under the evidence, that all the parties made extravagant representations in respect to the value of their property, and statements in regard to the title which, to say the least, were not known to be true; and in this respect we are unable to say that plaintiff in error appears in any worse light than Schroeder.   There is utterly no evidence that the prosecuting witness reposed confidence in plaintiff in error, and, in fact, the relation of the parties and the nature of their transactions are such as to rather repel the idea that either of the parties should have a special confidence in the other. The confidence of the prosecuting witness in plaintiff in error was apparently no greater than the plaintiff in error had in Schroeder.   No reason existed why either should have any particular confidence in the other.   We find here no evidence of any false and deceitful means employed for the purpose of obtaining the confidence of Schroeder in order to swindle him out of his money or property.   "Confidence game is any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler." (*Maxwell* v. *People,* 158 Ill. 248; *DuBois* v. *People,* 200 id. 157.)   This statute was never designed to apply to a business transaction between parties dealing on an equal footing, even though one of them may believe he has parted with more than he received.

The court erred in not setting aside the verdict for want of sufficient evidence.

The judgment is reversed.     *Judgment reversed.*